[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This is an action for dissolution of marriage and other relief brought to the Judicial District of Danbury.
Many of the facts that give rise to this action are not in dispute. The plaintiff, whose maiden name is Joyce A. Meyer, and the defendant were married in Dayton, Ohio, on December 14, 1968. Both the plaintiff and the defendant have resided continuously in the State of Connecticut for at least twelve months immediately prior to the date the complaint was filed. The marriage between the parties has broken down irretrievably without any reasonable CT Page 3950 prospects of reconciliation. There are three children, issue of the marriage, Gary Keegan, born September 7, 1970; Karen Keegan, born June 25, 1974; and David Keegan, born July 12, 1977, all of whom are over eighteen years of age. There are no minor children, issue of the marriage, and the plaintiff does not presently have any minor children. Neither the plaintiff or the defendant have received state assistance.
The court finds the following additional facts:
The parties are in dispute as to the cause of the breakdown of the marriage. The plaintiff's claim is that the marriage broke down for the following reasons: (1) the defendant is a perfectionist, with a difficult personality, with all issues having to be either black or white; (2) he has refused to support the household since 1980, both emotionally and also financially, except for short periods of times financially; (3) in the fall or winter of 1993, he moved to the basement of the family home and since the fall or winter of 1995, he has withdrawn from the family in so far as having any association with the family.
The defendant takes the position that the marriage has not broken down irretrievably. He further claims that in the event the marriage has broken down irretrievably, that the cause of the breakdown is as a result of the plaintiff having told him that she had stopped smoking prior to the marriage when she, in fact, did not stop smoking. He further believes that there has been financial mismanagement, and that he has been subjected to a boss/subordinate relationship with his wife and has become codependent upon her.
There is no credible evidence that there was any financial mismanagement of funds by the plaintiff. The court further finds that the defendant has not been subjected to a boss/subordinate relationship and further finds that the defendant has not become codependent upon the plaintiff.
From the evidence presented, the court finds that the primary fault for the cause of the breakdown of the marriage rests with the defendant.
When the parties married, neither had any assets.
The plaintiff is forty-nine years old, and in excellent health. The defendant is fifty-three years old, and in good CT Page 3951 physical health.
The defendant was born on January 31, 1944. He is in general good health. He does have some back problems as well as problems with his left hand and allergy problems. He is being monitored for prostate cancer and problems with two fingers on his right hand. None of his problems affect his employability.
When the parties moved to Connecticut in 1978, much of their personal property was stolen. They received a settlement in excess of $60,000 for the stolen property.
The parties purchased the present family home located at 20 Wn.brook Road, Newtown, Connecticut, in December, 1978.
The purchase price was approximately $95,000. The home was financed through a first mortgage of approximately $75,000, with a balance of approximately $20,000 being paid from the proceeds that the parties received from the sale of a home they owned in Ohio.
The first mortgage was refinanced in approximately 1993, and was increased from approximately $60,000 to $65,000 to approximately $85,000. The approximate $20,000 increase was used to reduce the home equity loan. All of the surplus funds from the refinancing of the first mortgage was used to pay down on the home equity loan.
The home is presently in need of general repairs. The court finds that the fair market value of the home is $225,000. It has a first mortgage of $73,938 and a second mortgage of $29,689. The total equity in the family home is $121,373.
The oldest child, Gary Keegan, obtained his high school degree in 1988, and started college in the fall of 1988 at the University of Connecticut at Storrs, Connecticut. His college was paid for, in part, by his own money, in part from some financial help from his parents, and in part from a $4000 loan that the plaintiff cosigned with him.
Karen started college in the fall of 1992 in Pennsylvania, and graduated in May of 1996. Her college costs were approximately $14,000 for the first year, $15,000 for the second year, $16,000 for the third year, and $17,000 for the fourth year. The parties agreed to obtain a home equity loan with only CT Page 3952 the plaintiff applying for the loan. They agreed that the defendant would not apply for the loan as he would not have any income to show for the three year period immediately prior to the loan. The home equity loan was obtained in 1992 for a credit line of $50,000. Karen obtained approximately $12,000 in student loans, which she is repaying.
David commenced college in August of 1995 at Virginia Tech in Virginia. He obtained some student aid and loans for his first year of college. The plaintiff took out a parent's loan called a Plus loan, in her name only, and used part of the home equity line fund for David's first year of college. His second year in college was financed by a Plus loan obtained by the plaintiff. His annual college cost is approximately $14,000.
The plaintiff has a gross weekly income from her position at Danbury Hospital of $1305.89, and a net weekly income of $953.85. She also works part-time at the Dress Barn where she averages nine to ten hours a week earning $6 an hour for a gross average of $54 to $60 per week, and a net weekly average of approximately $55.41 weekly. Her total weekly net income from all sources is $1009.26. She has five vehicles that are in her name consisting of a 1982 Olds, with a value of $500, that her son drives; a 1984 Cutlass, with a value of $500, that her daughter drives; a 1984 station wagon, with a value of $1000, that she drives; a 1986 Cutlass with a value of $1000, that the defendant drives; and a 1988 Honda, with a total value of $3500, and a loan of $3500 for no equity, that her son David drives. Although not shown on her financial affidavit, she has a set of Rosenthal China with a fair market value of a few thousand dollars.
The plaintiff, in her financial affidavit, shows an I.R.S. refund and a state refund. The I.R.S. refund is in the amount of $2196.98. The state refund is in the amount of $234.85. Each refund is from the 1995 tax return, and the amounts are presently being held in escrow by counsel for the defendant. The plaintiff's financial affidavit shows a home equity loan to First Fidelity. The balance due on that loan is $29,689. The parties had previously sold land that they owned in Ohio and received $15,000, less closing costs, from that sale. That money was used towards reducing the home equity line. Plaintiff's Exhibit 28 shows the use of the home equity line from 1992 through 1996, except for an error of approximately $10. The total home equity loan withdrawals for that period of time was $70,477.62. CT Page 3953
The withdrawals consist of the following:
YEAR AMOUNT
1992 $16,561.79
1993 $15,873.95
1994 $14,952.23
1995 $18,988.00
1996 $4,100.00
 PAY DOWN $19,352.00 (refinance 1993) $13,971.00 (Ohio sale) — APPROXIMATE
$33,323.00
 TOTAL WITHDRAWN $70,475.97 LESS PAY DOWN $33,323.00
OUTSTANDING BALANCE $37,152.97
Some payments have been made reducing the current balance to $29,689.
The plaintiff's financial affidavit also shows, under liabilities, a Plus loan used for educational purposes of $12,000, and another Plus loan used for educational purposes of $7000. The $12,000 Plus loan will have principal payments commencing when David graduates from college. He will take over the loan when he obtains employment. The plaintiff's financial affidavit, under liabilities, also shows a VISA loan used to purchase the computer for the daughter. The balance due is $2500. The funds were used as a graduation gift when Karen graduated college.
The plaintiff's financial affidavit shows, under stocks and bond, a USAA account. This is a refund that is available when all USAA insurance is terminated. It could be available upon the sale of the family home. The amount of the account is $2780. It is in the defendant's name only. Her financial affidavit shows three life insurance policies. The first is through Crown Life. It is in the face amount of $71,000 and has a cash surrender value of CT Page 3954 $5960.53. The cash surrender value of the policy is on the defendant's life. The second policy is a group life policy in the face amount of $100,000, that is owned by the plaintiff. The third policy is a $50,000 policy for accidental death through the plaintiff's credit union.
The cost to continue COBRA health benefits for the defendant, after the marriage is dissolved, would be $281 monthly.
The plaintiff has savings accounts totalling $502.72. She has a tax saving sheltered account with a balance of $7765.59. She also has a pension through the Danbury Hospital. That pension would pay to her $1041.39 monthly at age sixty-five. In the event she predeceased the defendant, he would be paid $520.70 for his life under a joint and survivor annuity. The defendant has a life insurance policy on the plaintiff's life with a cash surrender value of $1635.10. The plaintiff has a life insurance policy on the defendant's life with a cash surrender value of $5960.63.
When the parties married, the plaintiff had a degree in nursing. She obtained her Bachelor of Science in 1974 at Charter Oak College in Connecticut. She has attended part-time courses at Western Connecticut State University, and is approximately half way towards receiving her master's degree. When the parties married, the plaintiff was a Second Lieutenant in the United States Army working as a nurse. She remained in the military until approximately April of 1970, which was a few months prior to the birth of their first child in September, 1970.
The plaintiff started working at the Danbury Hospital in January, 1981, at an annual salary of approximately $17,000, as a nurse. She has had regular salary increases. Her present annual gross income is approximately $67,900.
Commencing 1992, she became a manager at the Danbury Hospital. Her primary occupation is that of a nurse.
The plaintiff's position as a manager at the Danbury Hospital involves three patient care units. She is paid an annual salary. Her job is secure. She currently has health insurance that covers herself, the defendant, and one child, David Keegan.
The cost for the plaintiff to attend Charter Oak College to obtain her degree was in the range of $150 to $300 annually. Her courses at Western Connecticut were free. Most of the expenses CT Page 3955 incurred towards her working for her master's degree have been reimbursed by Danbury Hospital. Although she does not need a master's degree to maintain her present employment, it would be beneficial to her. Many hospitals would require such a degree is she were to change employment to another hospital.
The defendant's financial affidavit shows a gross and net weekly income of $48. That represents his income for a one year period.
He has a total of $1385 in various bank accounts. He also has $2232.75 in stock with the Mead Corporation, in his name only, and an additional $293.18 in stock with the EV Traditional Growth Fund, in his name only.
He does not have any liabilities.
When the parties married, the defendant was in the United States Air Force. He left the Air Force in 1972. He then held a civil service job from 1972 to approximately 1974. He was then employed at the Mead Corporation in Ohio between 1974 and 1978. In 1978, the parties moved to Connecticut where the defendant became employed with Pitney-Bowes in Connecticut, commencing the fall of 1978. He voluntarily terminated that employment in June of 1980. He was earning approximately $38,000 a year when he voluntarily terminated his employment with Pitney-Bowes. He received unemployment compensation for a period of time after terminating his employment with Pitney-Bowes. He has two bachelor degrees and one master's degree. He is an electrical engineer by training. He set up a consulting business by the name of Specifications Services Company. He received an offer for employment with Digital Equipment near Boston after quitting Pitney-Bowes. The defendant wanted to commute to that job, and the plaintiff wanted to move the family to that general area. When the parties could not agree, the defendant turned down the position. For a period of four to five years prior to the time the plaintiff filed this action for dissolution of marriage, the defendant was not actively seeking any employment. After the plaintiff filed this action for dissolution of marriage, the defendant commenced seeking employment. He has had per diem jobs teaching at the Western Connecticut State University and Naugutuck Community College.
The defendant will need a Ph.D. degree in order to obtain full-time employment in the academic field. CT Page 3956
It will take him approximately two years to obtain his Ph.D.
The following represents the income of the parties for the calendar years 1990 through 1995 for which they filed joint income tax returns:
Year Plaintiff's Gross Income Defendant's Gross Income
1990 $53,508.77 (Danbury Hospital) $7232.04 (State of Connecticut)
 1991 $55,970.86 $9053.17
Gross income from Specifications Services — $350.00. No net taxable income from Specifications Services.
 1992 $18,990.51 plus $9267.34 $42,898.66 — both from Danbury Hospital for a total of — $61,889.17
1993 $62,653.00 $8586.83
 1994 $62,345.98 $6650.35
Gross receipts, Specification Services — $344.00 taxable income — $2.97
 1995 $62,891.92 (Danbury Hospital) $4331.71 (State of Connecticut) During this calendar year, the defendant also had job hunting expenses of — $2042.69
Between 1978 and 1989, the defendant's gross wages were as follows:
Year Earnings Year Earnings
1978 $21,056.37 1987 $6238.03
1979 $22,900.00 1988 $6333.25
1980 $20,185.19 1989 $6828.01 CT Page 3957
1981 $1600.00
1982 $802.52
1983 $6113.00
1984 $3540.00
1985 $9805.52
 1986 $33,509.08 — (This includes the defendant's unemployment compensation income.)
This court has considered the provisions of § 46b-81(c) regarding the issues of property, and has considered the provisions of § 46b-82 regarding the issues of alimony, and has considered the provisions of § 46b-62 regarding the issues of attorney's fees.
ORDERS
The court enters the following orders:
A. By way of dissolution:
1. The marriage between the parties is dissolved and each party is declared to be single and unmarried.
B. By way of alimony:
1. The defendant is ordered to pay to the plaintiff alimony in the sum of $125 per week, effective upon and to commence upon the date the defendant vacates the family residence. Alimony is to terminate at the earliest of the following events: (1) the death of the plaintiff; (2) the death of the defendant; (3) the remarriage of the defendant; (4) July 1, 1999. The defendant should have obtained his Ph.D. by this date, and will no longer have the need for alimony that he presently has due to his employability in the academic field.
Alimony is non-modifiable as to term. The provisions of §§ CT Page 395846b-86 (a) and 46b-86 (b) are applicable.
2. The plaintiff is to make available COBRA benefits for the benefit of the defendant for the maximum period allowed by law. The parties are to divide equally the $281 monthly cost for such benefits.
C. By way of property orders:
1. The I.R.S. refund in the amount of $2196.98, and the state refund in the amount of $234.85, is ordered divided equally between the parties.
2. The jointly owned property shall be placed on the market for sale immediately and shall be sold for the first reasonable offer. The parties have agreed to a value of $225,000, and the property shall be initially listed for that sale price. The parties shall reconsider the listing price every two months until such time as the property is sold. The parties must accept any offer within 5 percent of the listing price at any time. From the gross proceeds of sale, the following shall be paid: the real estate commission, closing costs, the first mortgage and home equity loan, and the remaining net proceeds shall be equally divided between the parties. Until such time as the property is sold, the wife shall have exclusive possession and control of the property, and she will be responsible for the continued payment of the obligations concerning said property until its date of sale. The husband shall vacate from the home within ninety (90) days or the sale date, whichever shall first occur. The husband shall be responsible for removal of all of his personal property within that period of time.
3. The plaintiff is to transfer to the defendant title to the 1986 Cutlass. She is to pay the insurance on that vehicle through July 1, 1997. The defendant shall be responsible for the insurance on that vehicle after July 1, 1997. All other motor vehicles shown on her financial affidavit are awarded to the plaintiff.
4. The parties have agreed to the division of the furnishings and personal possessions. All furnishings and personal possessions are awarded in accordance with that agreement.
5. All savings accounts shown on the plaintiff's financial affidavit are awarded to the plaintiff. CT Page 3959
6. All savings accounts shown on the defendant's financial affidavit are awarded to the defendant.
7. The Mead Corporation stock and the EV Traditional Growth stock, shown on the defendant's financial affidavit, is ordered to be divided equally between the parties.
8. The tax shelter annuity, shown on the plaintiff's financial affidavit, is awarded equally between the parties.
9. The plaintiff's pension plan is to be divided equally between the parties. The plaintiff is to elect a joint and survivor annuity.
10. The USAA account shall be closed when the house is sold, and the proceeds are ordered divided equally between the parties.
11. The cash surrender value of the two Crown Life insurance policies is ordered divided equally between the parties. Each party shall have the right to continue the policy on the other party's life, if desired. Neither party is ordered to continue the policy on the other party's life.
12. The plaintiff is to hold the defendant harmless on the two Plus educational loans shown on her financial affidavit.
D. By way of attorney's fees:
1. No attorney's fees are awarded in favor of either party.
E. Miscellaneous orders:
1. The parties are ordered to exchange copies of their federal and state income tax returns within thirty (30) days after such returns have been filed by certified mail, return receipt, or registered mail, return receipt, for so long as there is an outstanding support order.
2. Counsel for the plaintiff is to prepare the judgment file within thirty days and send it to counsel for the defendant for signature and filing.
Axelrod, J. CT Page 3960